# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
### WESTERN DIVISION

VICTOR BARRIOS MALDONADO,
through his Guardian Lidia Marina
Mazariegos Ochoa, and LIDIA MARINA
MAZARIEGOS OCHOA, individually as
wife of Victor Barrios Maldonado,

<div style="margin-left:2em">Plaintiffs,</div>

vs.

CITY OF SIBLEY, IOWA,

<div style="margin-left:2em">Defendant.</div>

No. 20-CV-4029-LRR

**ORDER**

_____

## TABLE OF CONTENTS

I.  INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .2

II.  RELEVANT PROCEDURAL HISTORY. . . . . . . . . . . . . . . . . . . . . . . .2

III.  SUBJECT MATTER JURISDICTION. . . . . . . . . . . . . . . . . . . . . . . . .2

IV.  SUMMARY JUDGMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .3

V.  RELEVANT FACTUAL BACKGROUND. . . . . . . . . . . . . . . . . . . . . . 4

VI.  ANALYSIS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

    A.  The Public Duty Doctrine. . . . . . . . . . . . . . . . . . . . . . . . . . . 6
        1.  Applicable law. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
        2.  Parties' arguments. . . . . . . . . . . . . . . . . . . . . . . . . .12
        3.  Application. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .14
    B.  Negligence Claims. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18
        1.  Gross Negligence. . . . . . . . . . . . . . . . . . . . . . . . . . .18
        2.  Negligence Per Se. . . . . . . . . . . . . . . . . . . . . . . . . . 20
        3.  Negligence. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .22

VII.  CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .23

# I. INTRODUCTION

The matter before the court is Defendant City of Sibley, Iowa's ("the City") Motion for Summary Judgment ("Motion") (docket no. 23).

# II. RELEVANT PROCEDURAL HISTORY

On June 11, 2020, Plaintiffs Victor Barrios Maldonado and Lidia Marina Mazariegos Ochoa (collectively, "Plaintiffs") filed the First Amended Complaint (docket no. 6). In the First Amended Complaint, Plaintiffs allege negligence (Count I), gross negligence (Count II), negligence per se (Count III) and loss of consortium (Count IV). *See generally* Amended Complaint ¶¶ 22-4[4]. On July 3, 2020, the City filed an Answer and Affirmative Defenses (docket no. 14).

On March 5, 2021, the City filed the Motion. On May 6, 2021, Plaintiffs filed the Resistance (docket no. 32).[1] On May 13, 2021, the City filed the Reply (docket no. 34). On June 28, 2021, a telephonic hearing was held, during which both parties had the opportunity to address the Motion. *See* June 28, 2021 Minute Entry (docket no. 36). The matter is fully submitted and ready for decision.

# III. SUBJECT MATTER JURISDICTION

Victor Maldonado is a Minnesota resident, residing in Worthington, Nobles County, Minnesota. First Amended Complaint ¶ 2. Lidia Ochoa is also a Minnesota resident, residing in Worthington, Nobles County, Minnesota. *Id*. ¶ 3. The City of Sibley, Iowa is located in Osceola County, Iowa, and is a municipality that may be sued under Iowa Code Section 670.2. *Id*. ¶ 4. In the First Amended Complaint, Plaintiffs

---

[1] On March 16, 2021, Plaintiffs filed an unresisted motion for extension of the deadline to resist the City's summary judgment motion. *See* Motion for Extension (docket no. 24). Plaintiffs requested an extension to May 6, 2021 to resist the summary judgment motion because the discovery deadline was April 15, 2021 and several depositions were scheduled for late March. *See generally id*. at 1-2. On March 18, 2021, the court granted Plaintiffs' motion and extended the deadline for filing their resistance to May 6, 2021. *See* March 18, 2021 Order (docket no. 27) at 2.

2

allege that the amount in controversy exceeds $75,000 and that assertion is not disputed. First Amended Complaint ¶ 5; Answer ¶ 5.

Accordingly, the court has diversity jurisdiction over the claims because complete diversity exists between the parties and the amount in controversy exceeds $75,000. *See* U.S.C. § 1332(a)(1) ("The district courts have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000 . . . and is between . . . citizens of different States."); *see also* First Amended Complaint ¶¶ 5-6.

## IV. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). "Summary judgment is proper 'if the pleadings, the discovery and disclosure materials on file, and any affidavits show'" an absence of a genuine dispute as to a material fact. *Hilde v. City of Eveleth*, 777 F.3d 998, 1003 (8th Cir. 2015) (quoting *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc)). "A dispute is genuine if the evidence is such that it could cause a reasonable jury to return a verdict for either party; a fact is material if its resolution affects the outcome of the case." *Massey-Diez v. Univ. of Iowa Cmty. Med. Servs., Inc.*, 826 F.3d 1149, 1157 (8th Cir. 2016) (quoting *Gazal v. Boehringer Ingelheim Pharm., Inc.*, 647 F.3d 833, 837-38 (8th Cir. 2011)). "The movant 'bears the initial responsibility of informing the district court of the basis for its motion,' and must identify 'those portions of [the record] . . . which it believes demonstrate the absence of a genuine issue of material fact.'" *Torgerson*, 643 F.3d at 1042 (alterations in original) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). Once the movant has done so, "the nonmovant must respond by submitting evidentiary materials that set out 'specific facts showing that there is a genuine issue for trial.'" *Id.* (quoting *Celotex Corp.*, 477 U.S. at 324).

On a motion for summary judgment, the court must view the facts "in the light most favorable to the nonmoving party." *Id.* (quoting *Ricci v. DeStefano*, 557 U.S. 557,

3

586 (2009)). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial," and summary judgment is appropriate. *Ricci*, 557 U.S. at 586 (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). "The nonmovant 'must do more than simply show that there is some metaphysical doubt as to the material facts. . . .'" *Torgerson*, 643 F.3d at 1042 (quoting *Matsushita*, 475 U.S. at 586). Instead, "[t]o survive a motion for summary judgment, the nonmoving party must substantiate [its] allegations with sufficient probative evidence [that] would permit a finding in [its] favor based on more than mere speculation, conjecture, or fantasy." *Williams v. Mannis*, 889 F.3d 926, 931 (8th Cir. 2018) (third alteration in original) (quoting *Barber v. C1 Truck Driver Training, LLC*, 656 F.3d 782, 801 (8th Cir. 2011)). Mere "self-serving allegations and denials are insufficient to create a genuine issue of material fact." *Anuforo v. Comm'r of Internal Revenue*, 614 F.3d 799, 807 (8th Cir. 2010). "Evidence, not contentions, avoids summary judgment." *Reasonover v. St. Louis Cty.*, 447 F.3d 569, 578 (8th Cir. 2006) (quoting *Mayer v. Nextel W. Corp.*, 318 F.3d 803, 809 (8th Cir. 2003)).

## V. RELEVANT FACTUAL BACKGROUND

The City owns and operates a municipal utility that supplies electricity to businesses and residents in the community. City's Statement of Undisputed Material Facts ("SUMF") (docket no. 23-2) ¶ 1. The City makes a profit from distributing and selling electricity to Sibley residents and businesses. Plaintiffs' Statement of Additional Material Facts ("SAMF") (docket no. 32-2) ¶ 1.[2] The City also sells and supplies

---

[2] In the City's Response to Plaintiffs' SAMF ("Response to SAMF") (docket no. 33), the City "objects to that portion of paragraph 1 reciting that it makes a profit from distributing and selling electricity for the reason that this is not a fact of consequence in determining any aspect of the pending action." Response to SAMF ¶ 1. The City does not deny that it makes a profit from the municipal utility. Further, as will become evident in addressing the arguments contained in the instant Motion, the fact that the City makes a profit from distributing and selling electricity is a relevant issue that will be addressed

electricity to the neighboring city of Bigelow, Minnesota, and to some surrounding rural customers. *Id*. ¶ 2. As it relates to safety standards, a municipal utility is regulated by the Iowa Utilities Board ("IUB"). SUMF ¶ 2.

At the time period pertinent to this case, Victor Maldonado was an employee of Gambino Drywall and Siding. *Id*. ¶ 3. On September 26, 2018, Maldonado was working on the of a building located at 839 3rd Avenue in Sibley, Iowa. *Id*. Specifically, Maldonado was working on the roof's rain gutters. *Id*. ¶ 4. While working on the rain gutters, Maldonado was electrocuted by high voltage current from a nearby power line. *Id*. As a result of the electrocution and subsequent fall from the roof of the building, Maldonado was severely injured. *Id*. ¶ 5.

The minimum distance between electric transmission lines and buildings is governed by Iowa Code section 478.20, which provides that a municipal utility "shall conform to any other rules, regulations, or specifications established by the utilities board, in the construction, operation, or maintenance of such lines." SUMF ¶ 6 (quoting Iowa Code § 478.20). The specifications established by the IUB are provided in Iowa Administrative Code Chapter 199, which provides in pertinent part that "[o]verhead and underground electric line minimum safety requirements to be applied in installation, operation, and maintenance are found in 199—Chapter 25, Iowa electrical safety code." SUMF ¶ 7 (quoting IAC § 199-11.1(2)). As it relates to the installation and maintenance of overhead electric supply lines, Iowa has adopted the National Electrical Safety Code ("NESC"). SUMF ¶ 2; *see also* IAC § 199-25.2(2)(a)(4)(b)(4). At the time the electrical pole in question was installed, sometime in the 1970s, the NESC required a minimum vertical clearance of 8 feet. SUMF ¶¶ 14-15. At the time of Maldonado's accident, the transmission wire which Maldonado came into contact with was approximately 10 feet, 5 inches above the roof and 9 feet, 2 inches above the parapet wall on the front of the building. *Id*. ¶ 16. Since 1990, the NESC has required a minimum clearance of 12 feet

_____

by the court in ruling on the Motion.

(1990 NESC) to 12.5 feet (2017 NESC).[3]  SAMF ¶ 8; *see also* Plaintiffs' Appendix (docket no. 32-3) at 6-9.

The City has committed inspections of its powerlines and other electrical infrastructure at least every five years.  SAMF ¶ 5.  The City did not record the clearance of the subject powerline during its inspections.  *Id*. ¶ 13.  In 2015, the City installed new transformers on the power pole closest to where Maldonado was injured.  *Id*. ¶ 6.  No building permits were issued in connection to the work being done on the building involved in Maldonado's fall.  SUMF ¶ 11.

The court finds that there are no issues of material fact precluding the granting of summary judgment.

## VI.  ANALYSIS

### A.  Public Duty Doctrine

#### 1.    Applicable law

"The public duty doctrine provides that 'if a duty is owed to the public generally, there is no liability to an individual member of that group.'"  *Kolbe v. State*, 625 N.W.2d 721, 729 (Iowa 2001) (quoting *Wilson v. Nepstad*, 282 N.W.2d 664, 667 (Iowa 1979)); *see also Johnson v. Humboldt County*, 913 N.W.2d 256, 259 (Iowa 2018) (providing that the public duty doctrine "does not allow individuals to sue the government for breach of duty owed to the public at large"); *Summy v. City of Des Moines*, 708 N.W.2d 333, 344 (Iowa 2006) ("[I]f the government owes a duty to the general public, it has no liability to any one individual when it fails to perform this public duty.").  "[A] breach of duty owed to the public at large is not actionable unless the plaintiff can establish, based on the unique or particular facts of the case, a special relationship between the State and the

---

[3]    The City denies this fact, stating "[t]he [NESC] recommends, it does not require."  Response to SAMF ¶ 8.  The City admits, however, that the NESC's "recommended clearance was 12.5 feet."  *Id*.  The City offers nothing to support its position that the NESC only recommends and does not require.  In fact, in the City's own SUMF, when discussing the minimum clearance in the 1970s, it states that "the NESC *required* a minimum vertical clearance of 8 feet."  SUMF ¶ 15 (emphasis added).

6

injured plaintiff[.]" *Kolbe*, 625 N.W.2d at 729. "The duty to the public can either arise from a statute or from the State's obligation to protect the public at large." *Id.*

In discussing the application of the public duty doctrine, the Iowa Supreme Court has stated that it "is clear that we have generally applied the public duty doctrine when the allegation is a government failure to adequately enforce criminal or regulatory laws for the benefit of the general public . . . or a government failure to protect the general public from somebody else's instrumentality[.]" *Breese v. City of Burlington*, 945 N.W.2d 12, 21 (Iowa 2020) (citations omitted). In *Fulps v. City of Urbandale*, 956 N.W.2d 469 (Iowa 2021), the Iowa Supreme Court explained more fully that:

> [T]he public duty doctrine generally comes into play only when there is a confluence of two factors. First, the injury to the plaintiff was directly caused or inflicted by a third party or other independent force. Second, the plaintiff alleges a governmental entity or actor breached a uniquely governmental duty, usually, but not always, imposed by statute, rule, or ordinance to protect the plaintiff from the third party or other independent force. Even then, the existence of a special relationship will negate the public duty doctrine.

*Id.* at 473-74.

"In practice, courts seem more likely to apply the public duty doctrine when a government employee negligently fails to act and allows harm to occur (nonfeasance) than when the employee negligently acts and causes harm (misfeasance)." *Breese*, 945 N.W.2d at 20 (quoting Ryan Rich, *Seeing Through the Smoke and Fog: Applying a Consistent Public Duty Doctrine in North Carolina After* Myers v. McGrady, 85 N.C. L. Rev. 706, 723 (2007)). In *Fulps*, the Iowa Supreme Court explained that "the term 'nonfeasance' refers to a failure to discharge a governmental duty for the benefit of the public—typically, a 'government failure to adequately enforce criminal or regulatory laws for the benefit of the general public . . . or a government failure to protect the general public from somebody else's instrumentality.' 'Nonfeasance,' in other words, means nonfeasance in the performance of a public duty." 956 N.W.2d at 475-76 (quoting *Breese*, 945 N.W.2d at 21).

In *Kolbe*, a driver with a visual impairment struck the plaintiff in that case causing the plaintiff severe injuries. 625 N.W.2d at 724. The plaintiff sued the state, alleging that the state had negligently issued a driver's license to the visually impaired driver in breach of statutory and common law duties. *Id*. at 726. The Iowa Supreme Court determined that the public duty doctrine applied and precluded the plaintiff's negligence claim against the state for issuing the driver's license to the visually impaired driver. *See generally id*. at 729-30. Specifically, the Iowa Supreme Court held that the licensing provisions in the Iowa Code were "for the benefit of the public at large," and, therefore, the plaintiff could not "avoid the preclusive effect of the public duty doctrine[.]" *Id*.

In *Raas v. State*, two individuals suffered injuries at the hands of two escaped prison inmates. 729 N.W.2d 444, 446 (Iowa 2007). One of the individuals was attacked in the parking lot of the state prison. *Id*. The other individual was attacked some distance away from the prison and off the prison's premises. *Id*. Both individuals alleged negligence based on statutory and common law duties. *Id*. at 447-48. The Iowa Supreme Court determined that the public duty doctrine was applicable to the off-premises individual because he was "only a member of the public at large," and, thus, his claim against the state was barred. *Id*. at 450. The other victim, however, as an "invitee" on to state premises and had a special relationship with the state making the public duty doctrine inapplicable. *Id*.

In *Estate of McFarlin v. State*, a claim was brought against the state on behalf of a child who was killed, alleging breach of statutory and common law duties. 881 N.W.2d 51, 56-57 & 63-64 (Iowa 2016). The child was killed in a boating accident, where the boat in which the child was riding struck a dredge pipe on a state-owned lake. *Id*. at 63. The Iowa Supreme Court noted that it was undisputed that "the dredge pipe and equipment were owned and operated by local entities, not the State." *Id*. at 64. Specifically, the plaintiff alleged that the state breached duties assuring the safety of the third-party dredging operation. *Id*. at 56-57 & 64. The Iowa Supreme Court determined that the public duty doctrine applied, holding that the "State's safety-related duties . . .

8

were owed to the general public," and precluded the plaintiff's claims against the state. *Id.* at 63.

In *Johnson*, the plaintiff sued the county for failing to remove a privately-owned concrete embankment in a ditch, relying on statutory duties and common law negligence. 913 N.W.2d at 259-60. The plaintiff fell asleep while driving, drove off the county road into the ditch and struck the concrete embankment, causing injury. *Id.* at 258. The Iowa Supreme Court determined that the public duty doctrine applied because "[a]ny duty to remove obstructions from the right-of-way corridor adjacent to the highway would be a duty owed to all users of this public road," and, therefore, concluding that the plaintiff's claims against the county were barred. *Id.* at 261-62.

In *Summy*, a golfer who was struck by an errant golf ball on a city-owned golf course, sued the city, arguing that the golf course was negligently designed causing an unreasonable danger to golfers on the eighteenth hole of being struck by tee shots from the first hole. 708 N.W.2d at 335-36, *overruled on other grounds by Alcala v. Marriott Int'l, Inc.*, 880 N.W.2d 699, 708 n. 3 (Iowa 2016). The Iowa Supreme Court determined that the public duty doctrine did not apply, finding that the alleged duty "was one owed to invitees on the golf course, not to the public at large." *Id.* at 344.

Recently, in *Fulps*, the Iowa Supreme Court discussed, at length, *Breese*, 945 N.W.2d 12 (Iowa 2020), a case where the Iowa Supreme Court determined that the public duty doctrine was inapplicable. 956 N.W.2d at 474-75. The Iowa Supreme Court explained that:

> [W]e held that the public duty doctrine did not shield a city from being sued over an allegedly hazardous and defective bike path that continued onto a sewer box. *Breese*, 945 N.W.2d at 15, 21. We distinguished the case from [decisions applying the public duty doctrine] by emphasizing that it involved the city's negligence with respect to the city's own bike path, as opposed to a failure to address a third-party hazard. *Id.* at 19-20. As we explained:
>
> > The [c]ity erected the sewer box and the paved pathway and connected them to each other. They were not instrumentalities built, owned, operated, or controlled by

9

anyone else. They were the [c]ity's. Here, a jury could find the [c]ity was affirmatively negligent in connecting the public pathway to the sewer box to give the sewer box the appearance that it was part of the public trail system. A jury could find that when the [c]ity connected the trail and the sewer box, it needed to take measures either to make the sewer box a safe part of the trail by adding guardrails or to warn pedestrians that the sewer box was not part of the public trail system.

*Id*. at 21.

*Breese* clarifies why the public duty doctrine and suits against municipalities over hazardous sidewalks can coexist. The public duty doctrine properly understood as a limit on suing a government entity for not protecting the public from harm caused by the activities of a third party. Those third parties have included the visually impaired driver in *Kolbe*, the inmates after they got away from the prison in *Raas*, the dredge operator in *Estate of McFarlin*, the private property owner who put up the concrete embankment in *Johnson*, and the shooter in *Sankey*. *See Breese*, 945 N.W.2d at 21 ("What is clear is that we have generally applied the public duty doctrine when the allegation is a government failure to adequately enforce criminal or regulatory laws for the benefit of the general public, as in *Raas*, *Kolbe*, and *Sankey*, or a government failure to protect the general public from somebody else's instrumentality, as in *Johnson* and *Estate of McFarlin*.").

*Fulps*, 956 N.W.2d at 474-75.

In *Fulps*, the Iowa Supreme Court addressed the public duty doctrine in the context of public sidewalks, in which the Iowa Supreme Court noted that "[c]ities in Iowa have a statutory duty and common law duty to build and maintain the public sidewalks in a safe condition and for breach of that duty have historically been subject to suit." *Id*. at 470. The Iowa Supreme Court determined that "[t]his historic rule is not at odds with the public duty doctrine." *Id*. The Iowa Supreme Court explained that:

Generally, [the public duty doctrine] comes into play when a governmental entity fails to take action (nonfeasance) with respect to a third party— typically by failing to exercise statutory authority with respect to the third party's activity. Such a failure to enforce a statute enacted for the public

benefit is considered a breach of a "public duty" and not enough to give rise to a tort action. But defectively constructed or poorly maintained sidewalks are a different matter. There, the governmental entity is simply being held legally responsible for its own property and work.

With these principles in mind, we conclude that a lawsuit brought by an injured pedestrian against a city over a defective city sidewalk should not have been dismissed for failure to state a claim based on the public duty doctrine.

*Id*. Next the Iowa Supreme Court reviewed 100 years of cases involving "[s]uccessful lawsuits against municipalities over hazardous sidewalks[.]" *Id*. at 471; *see generally id*. at 471-73 (discussing cases). In determining whether the public duty doctrine applied to sidewalk cases, the Iowa Supreme Court clarified that "'nonfeasance' in the context of the public duty doctrine does not mean that the [c]ity can install a sidewalk and never worry about maintaining it. Unless an exemption in Iowa Code section 670.4 applies, the [c]ity is liable for its sidewalk to the same extent a private property owner doing the same thing would be." *Id*. at 475. The Iowa Supreme Court noted one other consideration, "[a]s we put in *Johnson*, 'Cities, counties, and the state have to balance numerous competing public priorities, all of which may be important to the general health, safety, and welfare.' 913 N.W.2d at 266-67. This rationale, rooted in 'the limited resources of government entities,' has little applicability when the government has the ability to obtain indemnification. *Johnson*, 913 N.W.2d at 266." *Id*. at 476.[4] The Iowa Supreme Court concluded that "Fulps's petition alleges, 'At all times material to this matter, the section of uneven sidewalk along 86th Street was maintained by the Defendant City of Urbandale.' That pleading is sufficient to avoid application of the public duty doctrine for motion to dismiss purposes." *Id*.

---

[4] In *Fulps*, the city had "an ordinance making the abutting property owner responsible to keep the sidewalk in good repair." 956 N.W.2d at 473. The ordinance also gave the city a right to indemnification. *See id*. The Iowa Supreme Court noted that "[i]ndemnification and contribution would be much ado about nothing if the city were not liable to the sidewalk user." *Id*.

## 2.    *Parties' arguments*

The City asserts that "Plaintiffs' claims are barred by application of the public duty doctrine."  City's Brief in Support of Motion for Summary Judgment ("City's Brief") (docket no. 23-1) at 4.  Relying on IAC § 199-25.1(2), which provides that the purpose of the chapter "is to promote safe and adequate service to the public," the City asserts that "just as in *Kolbe*, where State licensing provisions were found to be for the benefit of the general public, *Johnson*, where the duty to remove obstructions from the right of way was a duty owed to all users of the road, *McFarlin*, where DNR oversight was for the benefit of the public at large, and *Raas*, where the fisherman was a member of the public at large, the regulations which give rise to [Plaintiff[s'] claim in the instant case are intended to promote safe and adequate service to the general public, and not to [Maldonado], individually."  *Id*. at 10.  The City maintains that "Plaintiffs have no evidence that the installation in question failed to comply with the applicable clearance requirements at the time of installation."  *Id*. at 10-11.

The City argues that "[t]he public duty doctrine applies to cases of nonfeasance; *i.e.*[,] when a government employee negligently fails to act and allows harm to occur, as opposed to cases of misfeasance, where the employee acts negligently and causes harm." *Id*. at 11 (citing *Breese*, 945 N.W.2d at 20).  The City contends that this "is clearly a case of nonfeasance to which the public duty doctrine applies, as opposed to malfeasance."  City's Brief at 11.  Specifically, the City argues that Plaintiffs' allegation is that the City "failed to comply with NESC minimum clearance requirements, not that it undertook to do so, but did the work in some manner that was negligent."  *Id*.  Finally, the City argues that "Maldonado was not a City invitee.  He was not on property owned by the City.  He was not on the roof of this building for any purpose related to the business of the City.  The City had no reason to know that he was even there.  The City did not issue any permits for the work being done in the building from which [Maldonado] fell. . . .  There is no basis for the allegation that the periodic line inspections done by the City are performed for the benefit of any individual or group of individuals, as

12

opposed to the public in general. There was no relationship between Victor Maldonado and the City . . .; special or otherwise." *Id*. at 13.

In their Resistance, Plaintiffs argue that the public duty doctrine is inapplicable because the doctrine "does not preclude liability for misfeasance—or affirmative conduct—committed by governmental entities" and because the City "was engaged in a proprietary function, and not a governmental one." Plaintiffs' Resistance at 6. As to misfeasance, Plaintiffs assert that "[i]t is undisputed that [the City] installed the electrical line just 10.5 feet from the Building—dangerously close to any maintenance projects that would be expected on this roof—thus acting in an affirmative manner that caused harm to Maldonado." *Id*. at 7. Plaintiffs contend that their "claim has been clear from the beginning: [the City] breached . . . duties by negligently locating and operating high voltage power facilities dangerously close to the building where Maldonado was working[.] . . . This is an allegation of misfeasance, not nonfeasance." *Id*. at 8-9. Relying on *Breese* and *Fulps*, Plaintiffs maintain that the City "affirmatively and negligently installed and maintained a structure that later caused harm. Thus, [the City's] misfeasance is not protected by the [public duty d]octrine and its motion should be denied on this basis." *Id*. at 9.

As to their proprietary argument, Plaintiffs assert that, "[b]y distributing and selling electricity, [the City] was acting in a proprietary capacity, precluding application of the public duty doctrine." *Id*. Relying on *Brown v. Sioux City*, 49 N.W.2d 853, 858 (Iowa 1951), Plaintiffs argue that "a municipality is engaged in a proprietary function when selling and distributing electricity to private consumers." Plaintiffs' Resistance at 10. Plaintiffs maintain that the City's "distribution and sale of electricity is a clearly proprietary function, and not a unique government function. Summary judgment should be denied on this ground." *Id*.

In reply, the City argues that "[t]his is precisely the type of case to which the [public duty] doctrine applies." The City asserts that:

The line at issue was installed in the early 1970's. . . . The line was 10'

13

5" above the roof and 9' 2" above the parapet wall of the roof. . . . At the time it was installed, the applicable Code['s] required a minimum clearance was 8 feet. . . .

The [IUB] requires the City to inspect each line every 10 years. [The City] inspects each line every five years. . . . According to Plaintiffs, despite this practice, these inspections failed to result in compliance with "new standards and practices."

The confluence of factors identified in *Fulps* is present here. First, the injury to [Maldonado] was directly caused by an independent force—electricity. Second, [P]laintiff[s] allege[] a government entity—the City of Sibley—breached a uniquely governmental duty imposed by statute to protect [Maldonado] from the independent force.

The City's Reply Brief (docket no. 34) at 2-3.

### 3. Application

At the outset, the court is unpersuaded by Plaintiffs' argument that "[b]y distributing and selling electricity, [the City] was acting in a proprietary capacity, precluding application of the public duty doctrine." Plaintiffs' Resistance at 9. In support of this proposition, Plaintiffs cite *Sunshine Heifers, LLC v. Washington State Dept. of Agriculture*, 355 P.3d 1204, 1208 (App. Ct. Wash. 2015). No Iowa court has ever cited *Sunshine Heifers*. Even more significantly, no Iowa court has ever specifically held that, by distributing and selling electricity, the public duty doctrine is inapplicable to a city. In fact, in the court's research of the issue, the court could not find any case, outside of Washington state, that has ever held that, by distributing and selling electricity, the public duty doctrine is inapplicable to a city. Further, Plaintiffs' reliance on *Summy*, 708 N.W.2d 333, for this proposition is also misplaced. In *Summy*, the Iowa Supreme Court held that the public duty doctrine was inapplicable "because the [c]ity's duty was one owed to invitees on the golf course, not to the public at large." 708 N.W.2d at 344. There is no basis for any interpretation that the *Summy* decision held that, by distributing and selling electricity, the public duty doctrine is inapplicable to a city.

In determining the applicability of the public duty doctrine, the court will review

14

the allegations in the First Amended Complaint. Plaintiffs allege negligence, gross negligence and negligence per se based primarily on the City negligently "locating and operating high voltage power facilities dangerously close to the building where Maldonado was working." First Amended Complaint ¶¶ 28 (negligence) & 35 (gross negligence). Similarly, in their negligence per se claim, Plaintiffs allege that the City "failed to comply with Iowa statutes, regulations, and codes, including but not limited to [IAC §] 199-25.2 and the [NESC], in placement and operation of its power facilities in the vicinity of the building Maldonado was working on at the time of his injuries." *Id*. ¶ 40.

It is undisputed that, with regard to safety standards, a municipal utility is regulated by the Iowa Utilities Board ("IUB"). SUMF ¶ 2. It is also undisputed that the minimum distance between electric transmission lines and buildings is governed by Iowa Code section 478.20, which provides that a municipal utility "shall conform to any other rules, regulations, or specifications established by the utilities board, in the construction, operation, or maintenance of such lines." SUMF ¶ 6 (quoting Iowa Code § 478.20). It is further undisputed that the specifications established by the IUB are provided in Iowa Administrative Code Chapter 199, which provides in pertinent part that "[o]verhead and underground electric line minimum safety requirements to be applied in installation, operation, and maintenance are found in 199—Chapter 25, Iowa electrical safety code." SUMF ¶ 7 (quoting IAC § 199-11.1(2)). It is also undisputed that, as it relates to the installation and maintenance of overhead electric supply lines, Iowa has adopted the NESC. SUMF ¶ 2; *see also* IAC § 199-25.2(2)(a)(4)(b)(4). Finally, it is undisputed that, at the time the electrical pole in question was installed, sometime in the 1970s, the NESC required a minimum vertical clearance of 8 feet. SUMF ¶¶ 14-15. It is also significant and undisputed that the IAC § 199-25.1(2) provides that "[t]he purpose of this chapter is to promote safe and adequate service to the public[.]" *Id*.; *see also* SUMF ¶ 8.

There are two important takeaways from the above undisputed facts. First, the

15

statutory authority enacted for the installation, operation and maintenance of power lines pertinent to this case is for the public's benefit. *See* SUMF ¶ 8; IAC § 199-25.1(2). Second, at 10 feet, 5 inches above the roof and 9 feet, 2 inches above the parapet wall on the front of the building, *see* SUMF ¶ 16, the power line was not only in compliance with the NESC's 8-foot minimum requirement when it was installed in the 1970s, but substantially in compliance. Additionally, NESC § 013.B.2 provides that "[e]xisting installations that currently comply with prior editions of the Code, need not be modified to comply with these rules except as may be required for safety reasons by the administrative authority." *Id.*; *see also* SUMF ¶ 13.[5] There is no evidence that the administrative authority, in this case, the IUB, has ever required the City to modify the powerline for safety reasons or any reason at all. It is also undisputed that the City inspects its powerlines at least every five years. *See* SAMF ¶ 5; *see also* City's Appendix (docket no. 23-3) at 94 (Envista Forensics Expert Report providing that "[b]oth the City of Sibley and the IUB routinely perform inspections of the poles, power lines and equipment. There were never any code violations, deficiencies or safety issues found by the IUB before or after the incident at this location").

Based on the foregoing facts, the court finds that the public duty doctrine is applicable in this case, barring Plaintiffs' claims against the City. Here, the height of the City's powerlines is regulated by state law, state regulations and the IUB for the benefit of the general public. *See Kolbe*, 625 N.W.2d at 729-30 (applying the public duty doctrine and holding that the licensing provisions in the Iowa Code were for the benefit of the public at large); *Estate of McFarlin*, 881 N.W.2d at 63 (applying the public duty doctrine and holding that the "State's safety-related duties . . . were owed to the general public"); *Johnson*, 913 N.W.2d at 261-62 (applying the public duty doctrine and holding

---

[5] Plaintiffs admit that NESC § 013.B.2 is commonly referred to as the grandfather clause but assert that this section contains two exceptions regarding installations. Plaintiffs' Response to SUMF ¶ 13. However, Plaintiffs do not state what these exceptions are and make no argument that any exceptions apply in this case.

that the duty involved was "owed to all users of this public road").

This is also a case of nonfeasance. In particular, the City properly installed the powerlines in the 1970s. Both the City and IUB routinely inspected the powerlines. The NESC provides that "[e]xisting installations that currently comply with prior editions of the Code, need not be modified to comply with these rules except as may be required for safety reasons by the administrative authority." NESC § 013.B.2; *see also* SUMF ¶ 13. There is no evidence that the IUB ever required the City to raise the powerline at issue in this case. Thus, the City's failure to raise the power line to 12.5 feet nearly 40 years after it was properly installed under state laws and regulations constitutes, at most, a failure to enforce a regulation for the benefit of the general public. *See Fulps*, 956 N.W.2d at 475-76.

Further, the two *Fulps* factors are present here. First, Maldonado's injury was caused by the negligence of a third-party actor, Maldonado's employer. Maldonado's employer had him working on the roof of the building with no safety features and failing to warn him of the potential danger posed by the power lines. Second, Plaintiffs allege that the City breached a uniquely governmental duty imposed by statute and administrative rule for the purpose of protecting the public at large. *See Fulps*, 956 N.W.2d at 473-74.

Finally, there is no evidence that, at the time of his injuries, Maldonado was an invitee of the City, that he was working on property owned by the City or that he was performing any work for the City. Additionally, no permits were issued by the City for the work that Maldonado was performing when he was injured. Thus, Maldonado had no special relationship with the City.

Accordingly, for all of the foregoing reasons, the court determines that the public duty doctrine applies to this case and the City is entitled to summary judgment on all of Plaintiffs' claims. *See Johnson*, 913 N.W.2d at 259 (providing that the public duty doctrine "does not allow individuals to sue the government for breach of duty owed to the public at large").

## B. Negligence Claims

In the alternative, the court finds that the City is also entitled to summary judgment on Plaintiffs' negligence claims.

### 1. Gross Negligence

Plaintiffs allege gross negligence based on the City negligently "locating and operating high voltage power facilities dangerously close to the building where Maldonado was working." First Amended Complaint ¶ 35. In their resistance brief, Plaintiffs concede that, in Iowa, a common law claim for gross negligence has been eliminated. *See* Plaintiffs' Resistance at 18. However, Plaintiffs assert that, for purposes of this case, gross negligence was reinstated in Iowa Code section 670.4(h). *See id.*

Recently, in *Lukken v. Fleischer*, --- N.W.2d ---, 2021 WL 2671322 (Iowa June 30, 2021), the Iowa Supreme Court addressed gross negligence:

> "Gross negligence" is not a distinct cause of action under our common law, but instead is a measure of conduct in a cause of action for negligence. *Unertl v. Bezanson*, 414 N.W.2d 321, 326-27 (Iowa 1987) (en banc). "In this state, as is well known, the actional character of negligence is not dependent upon its 'degree,' and the ancient differentiation into 'gross,' 'ordinary,' and 'slight' has come to mean little more than a matter of comparative emphasis in the discussion of testimony." *Denny v. Chi., R.I. & P. Ry.*, 150 Iowa 460, 464-65, 130 N.W. 363, 364 (1911). Under our common law "there are no degrees of care or of negligence in Iowa," *Tisserat v. Peters*, 251 Iowa 250, 252, 99 N.W.2d 924, 925-26 (1959), and we thus do not recognize a tort cause of action based on "gross" negligence as distinct from "ordinary" negligence. *Hendricks v. Broderick*, 284 N.W.2d 209, 214 (Iowa 1979).
>
> Yet analysis of "gross negligence" appears frequently in our cases interpreting statutes that employ the term. *See*, *e.g.*, *Thompson [v. Bohlken]*, 312 N.W.2d [501,] 504 [(Iowa 1981)] (interpreting the meaning of "gross negligence" in section 85.20); *Sechler v. State*, 340 N.W.2d 759, 761 (Iowa 1983) (en banc) (interpreting the meaning of "gross negligence" in section 306.41). . . .
>
> But we have warned that conceptions of "gross negligence" deriving from statutory uses of that term are not to be applied beyond those statutes. . . .

18

We later stated that, "[f]ar from creating a new basis of liability, the 'gross negligence' discussed in *Thompson* was a restriction, not an expansion, of the scope of negligence suits." *Unertl*, 414 N.W.2d at 327. The notion of gross negligence as including "wanton" conduct under 85.20 thus is "a concept limited by its terms to workers' compensation cases." *Id*. at 326-27.

*Lukken*, 2021 WL 2671322 at *6-*7 (fourth alteration in original).

Iowa Code section 670.4(1)(h) provides that:

1. The liability imposed by section 670.2 shall have no application to any claim enumerated in this section. As to any of the following claims, a municipality shall be liable only to the extent liability may be imposed by the express statute dealing with such claims and, in the absence of such express statute, the municipality shall be immune from liability:

. . .

h. Any claim based upon or arising out of a claim of negligent design or specification, negligent adoption of design or specification, or negligent construction or reconstruction of a public improvement as defined in section 384.37, or other public facility that was constructed or reconstructed in accordance with a generally recognized engineering standard, criteria, or design theory in existence at the time of the construction or reconstruction. A claim under this chapter shall not be allowed for failure to upgrade, improve, or alter any aspect of an existing public improvement or other public facility to new, changed, or altered design standards. This paragraph shall not apply to claims based upon gross negligence.

*Id*. Iowa Code section 384.37(19) defines "public improvement" and lists a variety of structures that constitute public improvements. *See* § 384.37(19)(a)-(m). Overhead power lines are not included in the list defining public improvements. *See id*. Further, overhead power lines are not a "public facility." *See* § 670.4(1)(h). Thus, § 670.4(1)(h) in inapplicable to this case. *See Lukken*, 2021 WL 2671322 at *7 ("'[G]ross negligence" deriving from statutory uses of that term are not to be applied beyond those statutes."). Accordingly, Plaintiffs' gross negligence claim fails as a matter of law and the City is entitled to summary judgment on Plaintiff's gross negligence theory.

19

## 2.    *Negligence Per Se*

Plaintiffs allege negligence per se based on the City failing "to comply with Iowa statutes, regulations, and codes, including but not limited to [IAC §] 199-25.2 and the [NESC], in placement and operation of its power facilities in the vicinity of the building Maldonado was working on at the time of his injuries." First Amended Complaint ¶ 40. In their resistance brief, Plaintiffs assert that the City "violated Iowa Administrative Code 199-25.4(1)[.]" Plaintiffs' Resistance at 16. Plaintiffs maintain that, "because the Iowa Administrative Code 199-25.4(1) was enacted for the safety and protection of persons like Maldonado, the negligence per se standard is applicable here[.]" Plaintiffs' Resistance at 17.

In *Wiersgalla v. Garrett*, 486 N.W.2d 290 (Iowa 1992), the Iowa Supreme Court explained the negligence per se doctrine as follows:

> [I]f a statute or regulation . . . provides a rule of conduct specifically designed for the safety and protection of a certain class of persons, and a person within that class receives injuries as a proximate result of a violation of the statute or regulation, the injuries "would be actionable, as . . . negligence per se." *Knoll* [*v. Manatt's Transportation Co.*], 253 N.W.2d [265,] 270 [(Iowa 1977)]. . . . To be actionable as such, however, "the harm for which the action is brought must be of the kind which [the statute] was intended to protect." *Knoll*, 253 N.W.2d at 270.

*Wiersgalla*, 486 N.W.2d at 292; *see also Winger v. CM Holdings, L.L.C.*, 881 N.W.2d 433, 448 (Iowa 2016) (following and citing *Wiersgalla* on the issue of negligence per se); *Gerard v. City of North Liberty*, 908 N.W.2d 541 (Table), 2017 WL 3525283, at *3 (Iowa Ct. App. Aug. 16, 2017) (same).

IAC § 199-25.4(1) provides in pertinent part that "[c]orrective action shall be taken within a reasonable period of time on all potentially hazardous conditions, instances of safety code noncompliance, maintenance needs, potential threats to safety and reliability, or other concerns identified during inspections." *Id*. It is undisputed that the power lines at issue in this case were inspected by the City and IUB multiple times after they were installed. Neither the IUB nor the City identified any potentially hazardous

conditions, instances of safety code noncompliance, maintenance needs, potential threats to safety or other concerns relating to the height of the power lines at issue here. Indeed, as discussed earlier in this order, the minimum distance between electric transmission lines and buildings is governed by Iowa Code section 478.20, which provides that a municipal utility "shall conform to any other rules, regulations, or specifications established by the utilities board, in the construction, operation, or maintenance of such lines." *Id*. The specifications established by the IUB are provided in Iowa Administrative Code Chapter 199, which provides in pertinent part that "[o]verhead and underground electric line minimum safety requirements to be applied in installation, operation, and maintenance are found in 199—Chapter 25, Iowa electrical safety code." IAC § 199-11.1(2). It is also undisputed that, as it relates to the installation and maintenance of overhead electric supply lines, Iowa has adopted the NESC. *See* IAC § 199-25.2(1).

It is further undisputed that, at the time the electrical pole in question was installed, sometime in the 1970s, the NESC required a minimum vertical clearance of 8 feet. SUMF ¶¶ 14-15. NESC § 013.B.2 provides that "[e]xisting installations that currently comply with prior editions of the Code, need not be modified to comply with these rules except as may be required for safety reasons by the administrative authority." *Id*. No administrative authority has every required the City to raise the power lines for safety reasons or any reason at all. At the time of Maldonado's accident, the power lines were 10 feet, 5 inches above the roof and 9 feet, 2 inches above the parapet wall on the front of the building where Maldonado was working. SUMF ¶ 16. Thus, the power lines were more than in compliance with the NESC's 8-foot minimum requirement when it was installed in the 1970s. SUMF ¶¶ 14-15. The court finds no evidence to support Plaintiffs' negligence per se claim under either IAC § 199-25.4(1) or the actual statutes and regulations governing power line clearance in Iowa. Accordingly, Plaintiffs' negligence per se claim fails as a matter of law and the City is entitled to summary judgment on Plaintiff's negligence per se theory.

### 3.     Negligence

Plaintiffs allege ordinary negligence based on the City negligently "locating and operating high voltage power facilities dangerously close to the building where Maldonado was working." First Amended Complaint ¶ 35. In their resistance brief, citing *Cronk v. Iowa Power & Light Co.*, 138 N.W.2d 843, 848 (Iowa 1965), Plaintiffs assert that "[t]he NESC minimum requirements are not dispositive on the issue of negligence." Plaintiffs' Resistance at 11. Further, relying *Evans v. Oskaloosa Traction & Light Co.*, 181 N.W. 782, 784 (Iowa 1921), *Coleman v. Iowa R., L. & P. Co.*, 178 N.W. 365, 370 (Iowa 1920) and *Loveless v. Wilton*, 188 N.W. 874, 877 (Iowa 1922), Plaintiffs contend that the City, "as an electricity supplier, is held to the highest degree of care." Plaintiffs' Resistance at 12. Finally, Plaintiffs argue that the City "violated its own adopted safety standards" by not adhering to the American Public Power Association ("APPA") safety manual, which recommends that utilities comply with the latest edition of the NESC, and by not adhering to the Lineman's and Cableman's Handbook, which urges utility workers to have knowledge of the NESC's safety rules and precautions. *See* Plaintiffs' Resistance at 14-15.

In order to succeed on a claim for negligence under Iowa law, a plaintiff "must show 'the existence of a duty to conform to a standard of conduct to protect others, a failure to conform to that standard, proximate cause, and damages.'" *Bandstra v. Covenant Reformed Church*, 913 N.W.2d 19, 41 (Iowa 2018) (quoting *Estate of Gottschalk ex rel. Gottschalk v. Pomeroy Dev., Inc.*, 893 N.W.2d 579, 586 (Iowa 2017)).

First, Plaintiffs' reliance on *Cronk*, *Evans*, *Coleman* and *Loveless* is misplaced. Each of those cases pre-date Iowa's statutory and regulatory adoption of the NESC, which governs powerline height requirements in Iowa. Second, Plaintiffs' reliance on the APPA safety manual and Lineman's and Cableman's Handbook is also misplaced. Neither publication has been adopted by Iowa for purposes of regulating municipal utilities. As such, the APPA safety manual offers recommendations, not requirements. Further, the Lineman's and Cableman's Handbook's general and generic emphasis on having

knowledge of safety rules in the NESC and other similar manuals does not create a duty as to the height of power lines in Iowa, which duty is regulated by Iowa statute and administrative rules.

As has been discussed throughout this order, the duty here, relates to the height of power lines next to buildings, which is governed by Iowa statutory law and Iowa regulations. *See* Iowa Code § 478.20; IAC §§ 199-11.1(2), 199-25.2(1) & NESC § 013.B.2. The court reiterates, again, that, at the time of Maldonado's accident the power lines were 10 feet, 5 inches above the roof and 9 feet, 2 inches above the parapet wall on the front of the building where Maldonado was working. SUMF ¶ 16. Thus, the power lines were fully in compliance with the NESC's 8-foot minimum requirement when they were installed in the 1970s. SUMF ¶¶ 14-15. As there is no evidence that any administrative authority has every required the City to raise the power lines for safety reasons or any reason at all, and, given the grandfather clause in NESC § 013.B.2, there is no evidence that the City breached its duty with regard to the height of the powerlines. Accordingly, Plaintiffs' negligence claim fails as a matter of law and the City is entitled to summary judgment on Plaintiff's negligence theory.

## VII. CONCLUSION

In light of the foregoing, it is hereby **ORDRED**:

(1) Defendant City of Sibley's Motion for Summary Judgment (docket no. 23) is **GRANTED**;

(2) The Clerk of Court is **DIRECTED** to enter judgment in favor of Defendant City of Sibley and against Plaintiffs Victor Barrios Maldonado and Lidia Marina Mazariegos Ochoa;

(3) The Final Pretrial Conference scheduled for September 23, 2021 is **CANCELED** and the trial date of October 18, 2021 is **RELEASED**; and

(4) The Clerk of Court is **DIRECTED** to **CLOSE THIS CASE**.

**IT IS SO ORDERED**.

**DATED** this 24th day of August, 2021.

LINDA R. READE, JUDGE
UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF IOWA

24